[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 10-14920

_____

D.C. Docket No. 6:07-cv-00897-JA-KRS

WYDELL EVANS,

Petitioner-Appellant,

versus

SECRETARY, DEPARTMENT OF CORRECTIONS,
ATTORNEY GENERAL OF FLORIDA,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(January 4, 2013)

Before DUBINA, Chief Judge, and TJOFLAT, CARNES, BARKETT, HULL,
MARCUS, WILSON, PRYOR, MARTIN and JORDAN, Circuit Judges.

PRYOR, Circuit Judge:

The issue in this appeal is whether a reasonable jurist could conclude that

evidence of a capital murderer's mental health problems, including antisocial

personality disorder; his crack cocaine and alcohol abuse; his life of crime,

including drug dealing, robberies of drug dealers, and regular use of firearms; and

his history of escalating violence, particularly toward women, was likely to be

more harmful than helpful if introduced as mitigation during the penalty phase of

his trial.  Wydell Evans shot and killed his brother's seventeen-year-old girlfriend,

Angel Johnson, two days after being released from prison.  During the penalty

phase of Evans's trial, the state presented evidence of his prior convictions, and

Evans's counsel presented evidence to portray his client in a positive light.  The

trial court followed the recommendation of the jury that Evans be sentenced to

death.  In state postconviction proceedings, Evans argued that his counsel had been

constitutionally ineffective for failing to discover and introduce evidence that he

had suffered a head injury at the age of three and had a long history of mental

health and behavioral problems.  Three mental health experts testified that Evans

suffered from antisocial personality disorder.  Lay witnesses also testified about

Evans's long history of violent behavior.  For example, Evans's brother, Oren

Evans, testified that Evans was "the angriest, most aggressive person [he had] ever

met" and recalled an occasion where Evans had searched for the mother of one of

his children only to take her home and "beat[] her up and all type of stuff."  And

one of Evans's former teachers stated that she was not "surprised or shocked"

when she heard that Evans had murdered someone; she was only "surprised it

[had]n't happen[ed] sooner."  The state trial court ruled that Evans's claim of

ineffective assistance of counsel failed, and the Supreme Court of Florida affirmed on the ground that Evans had failed to prove prejudice because his postconviction evidence of mitigation was more harmful than helpful.   Because that decision is reasonable, we affirm the denial of Evans's petition for a writ of habeas corpus.

## I.  BACKGROUND

We divide our discussion of the background of this appeal into four sections. First, we discuss the evidence introduced in the guilt phase of Evans's trial. Second, we discuss the evidence introduced in the penalty phase of Evans's trial. Third, we discuss Evans's postconviction challenges to his sentence in state court. Fourth, we discuss the procedural history of Evans's petition for a writ of habeas corpus.

### A. Guilt Phase

During the guilt phase, the state presented evidence that Evans's crime had been premeditated.  While incarcerated for an earlier parole violation, Evans had engaged in a heated argument with his brother's 17-year-old girlfriend, Angel Johnson, over the phone and told another prisoner that "[i]f I could get my hands on [Johnson,] I'll kill that bitch."  Two days after being released from prison, Evans shot and killed Johnson.

The shooting occurred in a car occupied by Johnson, Evans, Lino Odenat, Sammy Hogan, and Erica Foster.  The group first stopped for gas.  Evans

3

instructed the driver, Hogan, not to stop at the first two gas stations they visited because "too many police" were patrolling the area.

Shortly after leaving the gas station, Johnson and Evans began to argue about Johnson's alleged unfaithfulness to Evans's brother, Oren. When Hogan intervened to tell Evans that Johnson was not cheating on his brother, Evans instructed Hogan to stay out of the argument and punched the windshield of the car with sufficient force to crack the windshield. Evans told Johnson, "You're not going to cheat on my brother like my girlfriend cheated on me." At some point during the argument, Johnson laughed. Evans responded, "You think it's funny? You think it's funny?" Evans then pulled out a gun and pointed it at Johnson. Johnson put her hands up and said, "Alright, Wydell, Alright." Despite Johnson's pleading, Evans shot Johnson in the chest.

Johnson fell into Foster's lap and said, "Wydell, you shot me for real. You shot me for real." Johnson began gasping for air and Odenat tried to roll down a window to give her some air. Evans ordered Odenat not to roll down the window and stated, "That bitch is dead. She's dead." Immediately after shooting Johnson, Evans began threatening the other passengers in the car with the gun and telling them that he would kill them if they told anyone that he had killed Johnson. Evans then ordered Hogan to drive the car to the home of his friend, Jerry Davis.

4

Evans told Davis that he "missed and shot the girl" and asked Davis if he could borrow some money.  Davis gave Evans $40, and Evans returned to the car.  Evans ordered Hogan to drive to a nearby parking lot.  There Evans warned Foster and Hogan that, if they told anyone that he had shot Johnson, he would kill them, and he would "get the whole family."  Evans told them that he was "dead-ass serious" and "swore on his grandma's grave" and "to God."  He warned, "If I go to jail I'm going to get out because I've done something like this before and I've got out before."  He then tried to wipe his fingerprints from the car before allowing Foster and Hogan to take Johnson to the hospital.  Despite Evans's threats, both Foster and Hogan eventually identified Evans as Johnson's killer.  Evans was indicted for first-degree premeditated murder, kidnapping, and aggravated assault.

Evans testified that he had found the gun in the front seat of the car and that the gun had accidentally discharged when he tried to hand it to Johnson in the back seat.  He also testified that, although he was "slightly intoxicated" on the night that he shot Johnson, he had a "clear recollection of what happened" and "knew what was going on" at the time.  He conceded that, when he shot, Johnson he was "perfectly aware of everything" and "functioning fine."  A Florida jury convicted Evans of all three counts.  See Evans v. State, 838 So. 2d 1090, 1092 (Fla. 2002).

5

*B. Penalty Phase*

During the penalty phase, the state proved that Evans had two previous convictions for battery upon a law enforcement officer, a previous conviction for aggravated battery, and that Evans was on probation for felony possession of a firearm and escape when he shot Johnson. Evans's previous convictions were uncontested. Indeed, Evans testified about three violent felonies that he committed.

Evans's counsel presented evidence of Evans's positive characteristics. Several character witnesses described Evans "as a generous man, a good father, a loving and obedient son and grandson, a good friend, and someone who counseled children to stay out of trouble by staying in school." Evans v. State, 946 So. 2d 1, 4 (Fla. 2006). Evans's mother, Lilly Evans, testified that his father had died when Evans was three years old, that she had been addicted to crack cocaine during part of his childhood, that her addiction had contributed to his downfall, and that he had been her inspiration to stop abusing the drug.

Several witnesses testified about Evans's upbringing and his supportive relationship with some of his family members, particularly his grandmother. Lilly admitted that, although she left her son in his grandmother's care for a period of time, he had never been deprived physically of anything; he had always had a home in which to live and food to eat; and he had been a "normal" and "obedient"

6

child who had received "okay grades." Lilly also testified that Evans was close to the five children he had with different women and that the mother of one of his children had died. Evans's cousin, Minnie Jarrett, testified that Evans's grandmother raised Evans when his mother was unable to care for him; that his grandmother was a "very religious Christian woman" who "maintained that aspect of her life within her household"; and that his grandmother was a "[v]ery loving and caring woman" who provided Evans with "the things that he needed, love and support and the material things that he needed." According to Jarrett, Evans's grandmother "treated [Evans] like [] he was her own son." A family friend, Linda Key, agreed that Evans had been part of a "loving family" and had been "provided support emotionally, financially, everything." Evans's aunt, Sandra Evans, testified that Evans had helped in the care of his grandmother after his grandmother had a stroke. Evans had even changed his grandmother's diapers and had paid Sandra's bills while Sandra was caring for his grandmother.

Evans testified about his criminal history. He admitted that, although he had been hurt by his mother's cocaine addiction, her addiction had not caused him to "los[e] control of [his] identity." He testified that he had dropped out of school not because his mother had failed to take care of him, but "[b]ecause [he] was engaged in crime. [He] was out there, you know, as they say these days, thuddin'. [He] was doing what a lot of other teenagers do." Evans also testified about his history

7

of incarceration and some of the details of his crimes. Evans admitted that he was first imprisoned at age 17 and released at age 18. Within seven to nine months after his release, Evans committed another crime for which he returned to prison for two years. After Evans was released again, he committed another crime and was incarcerated for two and a half to three years. Evans admitted that one of his previous crimes involved him "jump[ing] on some dude on a motorcycle." Another conviction related to an occasion where Evans injured an "officer in the throat." And yet another conviction involved him "kick[ing] [an] officer in his . . . private area." Following Evans's last conviction before this appeal, he was out of prison for about a year before he was incarcerated again for a parole violation. Then, after being out of prison for two days, Evans shot Johnson. See id. at 3.

No evidence of Evans's mental health was presented during the penalty phase. While preparing for the penalty phase, Evans's attorney had read a presentencing report in which Evans had reported that his mental health was perfect and that he had seen a psychologist only as a youth. Neither side presented any evidence that Evans suffered from a mental disorder.

The jury recommended a sentence of death by a vote of ten to two, and the trial court sentenced Evans to death for the first-degree murder conviction. The trial court found two aggravating circumstances: (1) Evans had previously been convicted of violent felonies, Fla. Stat. § 921.141(5)(b), and (2) the crime was

8

committed while Evans was on probation, id. § 921.141(5)(a). See id. at 4. The trial court did not find any statutory mitigators, but found five nonstatutory mitigators: "(1) Evans experienced an abused or deprived childhood; (2) he contributed to society; (3) he performed charitable deeds; (4) he counseled youth to avoid crime and stay in school; and (5) he exhibited good behavior in prison." Id. at 5 n.3. The Supreme Court of Florida affirmed Evans's convictions and death sentence on direct appeal, Evans v. State, 838 So. 2d 1090 (Fla. 2002), and the Supreme Court of the United States denied his petition for a writ of certiorari, Evans v. Florida, 540 U.S. 846, 124 S. Ct. 121 (2003).

## C. State Postconviction Proceedings

Evans filed a motion for postconviction relief. The state trial court heard testimony from several lay witnesses and three mental health experts. Evans, 946 So. 2d at 5. Evans's new mitigation evidence, in contrast with the evidence introduced in the penalty phase of his trial, presented a more troubled and violent history. The new evidence established that Evans had suffered a head injury when he was young, had experienced a troubled childhood, had abused alcohol and drugs, had suffered from poor impulse control, and had exhibited aggression, especially toward women.

Evans had been hit by a car when he was three-years-old and sustained a "head injury." Evans's mother Lilly testified about how Evans's speech and

9

language patterns had changed after the accident and how Evans had developed a "very, very bad stuttering problem." Two experts, Dr. Richard Carpenter and Dr. Henry Dee, testified that Evans "had brain damage attributable to his head injury." Id. at 7. The expert for the state, Dr. Harry McClaren, agreed. Id.

"Dr. Carpenter and Dr. Dee departed from Dr. McClaren over whether Evans'[s] brain damage led to any particular behavior." Id. at 7–8. Specifically, Dr. Carpenter and Dr. Dee believed that Evans "suffered from an uncontrollable rage reaction or impulse disorder as a result of the brain damage," but Dr. McClaren "did not agree that Evans'[s] brain dysfunction led him to behave in any particular way." Id. at 8. Dr. McClaren testified that a "concussion" is a form of a closed head injury and is a "very common experience in life."

Dr. Carpenter and Dr. Dee also parted ways with Dr. McClaren about whether Evans met the criteria for the two statutory health mitigators, Fla. Stat. § 921.141(6)(b), (f). Both Dr. Carpenter and Dr. Dee testified that, because of his impulse disorder, "Evans was under the influence of extreme mental or emotional disturbance at the time of the offense and that Evans'[s] capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired at the time of the offense." Id. at 8. But Dr. McClaren "believed that Evans'[s] actions during the car ride and after the shooting indicated that Evans was in control of the situation and was making the decisions in the car."

10

Id. at 9.  According to Dr. McClaren, Evans understood the criminality of his conduct and did not suffer from extreme mental or emotional disturbance when he killed Johnson.  Id.

All three experts discussed how Evans had started to abuse alcohol at a young age.  "Both Dr. Carpenter and Dr. McClaren characterized Evans as narcissistic and not wanting to admit anything that puts him in a bad light," id. at 7, and Dr. Carpenter explained that someone with a narcissistic personality is "someone who is very self-centered, a grandiose sense of themselves."  All three experts testified that Evans probably had antisocial personality disorder.  Dr. Carpenter stated unequivocally that "[t]here is absolutely no doubt" about whether Evans had antisocial personality disorder, and Dr. McClaren agreed that "I don't think there is much doubt [Evans] meets the criteria for [antisocial personality disorder]."  Dr. Carpenter conceded that "in laymen's terms . . . Wydell Evans is diagnosed as a bad dude who commits criminal acts when he's drunk."  Dr. McClaren agreed that "alcohol consumption was a significant factor in some of [Evans's] behavioral problems" and testified that Evans had used crack cocaine in the past.

Evans also presented evidence of his long history of behavioral problems and aggression.  Lilly contradicted her trial testimony that Evans had been an obedient child and stated instead that "he really [had been] disobedient to [her],

11

getting worse and worse." Lilly also admitted that she knew that Evans had "got[ten] involved in drugs and the selling of crack cocaine" and had "carr[ied] guns" during his "teenage years." Lilly testified that Evans had an "explosive temper."

Evans's brother, Oren, testified that Evans "had a very bad temper problem" and described Evans as "the angriest, most aggressive person [he had] ever met." Oren recounted how Evans had "slapped" two guys for disagreeing with him about who was a better basketball player, Michael Jordan or Scottie Pippen. About this incident, Oren testified that Evans "wanted to be like the man. He wanted to run the show. He was like king of the world, the hardest guy in the world, gangster." Oren also testified that he had heard about incidents in which Evans threw rocks at a police officer and attacked teachers. He confirmed that Evans was "into guns" and was known to carry guns.

Witnesses also testified about Evans's history of violence toward women. Oren testified about an occasion in which Evans had tried to find the mother of one of his children. Evans rode "around town looking for her . . . . [H]e was kicking in doors looking for her. He was just swinging on people, fighting people." When Evans finally found the woman after a three day search, he took her to his home and started "beating her up and all type of stuff." The next day, when Oren urged Evans to stop beating the woman, Evans told Oren to "mind [his] own business"

12

and "pulled a gun on [him.]"  Oren testified that Evans had beat up his other girlfriends too.  One of the mental health experts reported that Evans had admitted that he had once "punched his wife in the mouth for calling him another man's name."  Another expert testified that Evans had admitted that he had "struck" a "school aide" and "pushed" a teacher.

Several witnesses testified about Evans's escalating aggression while he was in school.  When Evans was still in elementary school, he "was placed in a class for children with learning disabilities and received speech therapy."  Id. at 6.  One of the mental health experts testified that, based on his review of Evans's school record, "his behavior got worse at around twelve and thirteen, which was associated with a number of changes in his life, including starting to use alcohol and starting to be involved in criminal activity."  Barbara McFadden, a high school teacher and counselor, testified that Evans had an average intelligence, but he had learning disabilities.  She also testified that when she read in the newspaper that Evans was on trial for murder, she was not "surprised or shocked."  Instead, she was "surprised it didn't happen sooner."

Margaret O'Shaughnessy, a retired counselor for special needs students, remembered Evans because she "felt with all [her] heart that [Evans] was capable of very great violence.  It was like he was at a higher plane or level or more disturbed than the other students that we had in the emotional education."

13

O'Shaughnessy recounted two incidents in which Evans had attacked a student and a teacher. In one incident, he had attacked a female student while she boarded a school bus, and in the other incident, he had pushed a female teacher who had reported him for misbehavior. O'Shaughnessy testified that, at some point, Evans had been "classified as emotionally handicapped and [] recommended for the severely emotionally disturbed program in high school, a program for the most violent students." Id. at 7.

The postconviction evidence also provided new details about Evans's criminal activities. The evidence established that Evans had dropped out of school at age 16 and that, by that time, he had "already begun to establish a criminal record involving violent crimes." Id. By the time he was 28 years old, "he had served eight to nine years in prison and juvenile detention facilities, and was on probation for two separate felony convictions." Id. (footnote omitted). At the evidentiary hearing, Evans bragged that he was a "jack boy" because he "rob[bed] drug dealers" and that he only felt "ready" when he had a gun strapped on.

After the trial court weighed all of this evidence, it ruled that Evans had not proved that he was prejudiced by his trial counsel's failure to discover and present the evidence offered during the evidentiary hearing. The Supreme Court of Florida identified Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984), as providing the applicable standard and affirmed the decision of the state trial court.

14

The state supreme court declined to address whether defense counsel's failure to present the additional evidence of mitigation was deficient performance because "Evans . . . failed to demonstrate that he was prejudiced." Evans, 946 So. 2d at 12.

The Supreme Court of Florida explained that much of the additional mitigation evidence presented a "double-edged sword" because the evidence "would likely have been more harmful than helpful" or the evidence would have opened the door to damaging evidence:

> Evans has failed to establish prejudice because the mitigation evidence he presented at the evidentiary hearing would likely have been more harmful than helpful. "An ineffective assistance claim does not arise from the failure to present mitigation evidence where that evidence presents a double-edged sword." Reed v. State, 875 So. 2d 415, 437 (Fla. 2004). While the testimony presented at the evidentiary hearing established that Evans suffered from mental health problems, it also displayed a long history of behavioral problems and escalating violence throughout his school career. Presenting this evidence at the penalty phase would have resulted in the jury hearing about Evans' aggression towards students and teachers, his aggression towards police officers, his pride in being known as a "jack-boy" because he robs drug dealers, and his habit of carrying a gun. It is just as likely that this evidence would have been more "aggravating" than mitigating. See Reed, 875 So. 2d at 436–37 (denying ineffective assistance claim because "even if [defense] counsel had . . . investigated further, the testimony that could have been presented was just as likely to have resulted in aggravation against rather than mitigation for [the defendant]").

Evans, 946 So. 2d at 13. The Supreme Court of Florida explained also that the mental health opinion evidence that Evans had been unable to control his actions

15

when he killed Johnson was contradicted by Evans's own testimony at the guilt phase of his trial that "he had a 'clear recollection' of the shooting because he was focused and in control." Id. The court concluded that "Evans ha[d] not established that there is a reasonable probability that his sentence would have been different had counsel discovered and presented the mitigation evidence Evans presented at the evidentiary hearing." Id.

### D. Federal Habeas Corpus Proceedings

Evans timely filed a petition for a writ of habeas corpus in the district court. The petition raised fifteen claims, including a claim that trial counsel was ineffective during the penalty phase. The district court "agree[d]" with the Supreme Court of Florida that Evans "had not established prejudice." Evans v. Sec'y, Dep't of Corr., no. 6:07-CV-897-orl-28KRS, 2010 WL 3834760, *16 (M.D. Fla. Sept. 29, 2010). The district court explained that the state supreme court "address[ed] the new mitigating evidence in its opinion, and found that although the evidence established [Evans] suffered from mental health problems, the evidence also showed a history of escalating violence." Id. at *18. The district court agreed with the Supreme Court of Florida that "additional evidence presented at the post-conviction evidentiary hearing would have furthered the view that [Evans] was merely a violent person who had a history of threatening and hitting other people, especially women." Id. at *17. The district court reasoned that the

16

potential mitigating effect of the evidence that Evans had "suffered from a head injury that may have triggered an impulse control disorder is outweighed by the numerous accounts of violent conduct on the part of [Evans] and the fact that [Evans] testified that he knew what he was doing and was in control when the shooting occurred." Id. at *18. The district court denied the petition because it could not "say that the state court's application of the Strickland prejudice standard was objectively unreasonable." Id. at *19. Evans appealed the judgment of the district court.

A panel of this Court vacated the decision of the district court and remanded the case with instructions to grant the writ of habeas corpus as to the claim of ineffective assistance of counsel during the penalty phase. Evans v. Sec'y, Dep't of Corr., 681 F.3d 1241 (11th Cir. 2012). After Florida filed a petition for rehearing, we vacated the panel decision and ordered rehearing en banc. Evans v. Sec'y, Dep't of Corr., 686 F.3d 1321 (11th Cir. 2012). We directed the parties to brief and argue one issue: whether Evans is entitled to a writ of habeas corpus because his counsel failed, in the penalty phase, to present the mitigating evidence that Evans presented on state collateral review.

## II.  STANDARD OF REVIEW

"Under [the Antiterrorism and Effective Death Penalty Act of 1996], a federal court may not grant a habeas corpus application 'with respect to any claim

17

that was adjudicated on the merits in State court proceedings,' 28 U.S.C. § 2254(d), unless the state court's decision 'was contrary to or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,' § 2254(d)(1)." Johnson v. Upton, 615 F.3d 1318, 1329 (11th Cir. 2010) (quoting Berghuis v. Thompkins, --- U.S. ---, 130 S. Ct. 2250, 2259 (2010). "The Supreme Court has described this standard as 'a highly deferential' one that 'demands that state-court decisions be given the benefit of the doubt.'" Id. (quoting Renico v. Lett, 559 U.S. ---, 130 S. Ct. 1855, 1862 (2010). The decision of a state court is not "contrary to" federal law unless it "contradicts the United States Supreme Court on a settled question of law or holds differently than did that Court on a set of materially indistinguishable facts." Cummings v. Sec'y for Dep't of Corr., 588 F.3d 1331, 1355 (11th Cir. 2009) (quoting Kimbrough v. Sec'y, Dep't of Corr., Fla., 565 F.3d 796, 799 (11th Cir. 2009)). The decision of a state court is not an "unreasonable application" of federal law unless the state court "identifies the correct governing legal principle as articulated by the United States Supreme Court, but unreasonably applies that principle to the facts of the petitioner's case, unreasonably extends the principle to a new context where it should not apply, or unreasonably refuses to extend it to a new context where it should apply." Id. (quoting Kimbrough, 565 F.3d at 799). "The question under [the Act] is not whether a federal court believes the state

18

court's determination was correct but whether that determination was unreasonable—a substantially higher threshold." Id. (quoting Schriro v. Landrigan, 550 U.S. 465, 473, 127 S. Ct. 1933, 1939 (2007)).

The Supreme Court has held that "an unreasonable application of federal law is different from an incorrect application of federal law." Harrington v. Richter, ---U.S. ---, 131 S. Ct. 770, 785 (2011) (quoting Williams v. Taylor, 529 U.S. 362, 410, 120 S. Ct. 1495, 1522 (2000)). "To obtain habeas relief 'a state prisoner must show that the state court's ruling on the claim being presented in the federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" Reese v. Sec'y, Fla. Dep't of Corr., 675 F.3d 1277, 1286 (11th Cir. 2012) (quoting Richter, 131 S. Ct. at 786–87). When evaluating a state prisoner's petition, "a habeas court must determine what arguments or theories supported or, [if none were stated], could have supported[] the state court's decision; and then it must ask whether it is possible that fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme Court]." Id. at 1286–87 (quoting Richter, 131 S. Ct. at 786).

The Supreme Court has also been clear that "[e]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more

19

general the rule, the more leeway courts have in reaching outcomes in case-by-case

determinations." Richter, 131 S. Ct. at 786 (quoting Yarborough v. Alvarado, 541

U.S. 652, 664, 124 S. Ct. 2140, 2149 (2004)). "The Strickland standard is a

general one, so the range of reasonable applications is substantial." Premo v.

Moore, --- U.S. ---, 131 S. Ct. 733, 740 (2011) (quoting Richter, 131 S. Ct. at 788).

### III.  DISCUSSION

To prevail on his claim that his trial counsel rendered ineffective assistance

during the penalty phase, Evans must establish "both that trial counsel's

'performance was deficient, and that the deficiency prejudiced the defense'" during

the penalty phase. Ponticelli v. Sec'y, Fla. Dep't of Corr., 690 F.3d 1271, 1294

(11th Cir. 2012) (quoting Wiggins v. Smith, 539 U.S. 510, 521, 123 S. Ct. 2527,

2535 (2003)). But if we conclude that the Supreme Court of Florida reasonably

applied clearly established federal law when it decided that Evans had failed to

establish prejudice, we may affirm the denial of Evans's petition without

addressing whether the performance of his counsel was deficient. As the Supreme

Court has explained, "If it is easier to dispose of an ineffectiveness claim on the

ground of lack of sufficient prejudice, which we expect will often be so, that

course should be followed." Strickland 466 U.S. at 697, 104 S. Ct at 2069.

To establish prejudice, a petitioner must "show[] that counsel's errors were

so serious as to deprive the defendant of a fair trial." Id. at 687, 104 S. Ct. at 2064.

20

Prejudice is established when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694, 104 S. Ct. at 2068. "When a [petitioner] challenges a death sentence . . . , the question is whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Id. at 695, 104 S. Ct. at 2069. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694, 104 S. Ct. at 2068. The difference between the reasonable probability standard "and a more-probable-than-not standard is slight and matters 'only in the rarest case.'" Richter, 131 S. Ct. at 792 (quoting Strickland, 466 U.S. at 697, 104 S. Ct. at 2069). "The likelihood of a different result must be substantial, not just conceivable." Id. at 792. In determining whether there is a reasonable probability of a different result, "we consider 'the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding'—and 'reweig[h] it against the evidence in aggravation.'" Porter v. McCollum, 558 U.S. 30, 130 S. Ct. 447, 453–54 (2011) (quoting Williams, 529 U.S. at 397–98, 120 S. Ct. at 1515).

The Supreme Court of Florida reasonably applied Strickland when it ruled that Evans had failed to establish prejudice.  The Supreme Court of Florida correctly identified Strickland as the controlling federal law and concluded that Evans could not establish prejudice under Strickland because the mitigation evidence was a "double-edged sword," Evans, 946 So. 2d at 13 (quoting Reed, 875 So. 2d at 437), that "would likely have been more harmful than helpful," id.  That conclusion was reasonable in the light of recent decisions of the Supreme Court holding that prejudice had not been established when evidence offered in mitigation was not clearly mitigating or would have opened the door to powerful rebuttal evidence, see Cullen v. Pinholster, --- U.S. ---, 131 S. Ct. 1388 (2011); Wong v. Belmontes, 558 U.S. 15, 130 S. Ct. 383 (2009), as well as our several decisions holding that it is reasonable to conclude that a defendant was not prejudiced when his mitigation evidence "was a two-edged sword or would have opened the door to damaging evidence," Ponticelli, 690 F.3d at 1296 (quoting Cummings, 588 F.3d at 1367).

The decision of the Supreme Court of the United States in Belmontes is instructive.  Belmontes argued that his trial counsel had failed to present evidence that he had "suffered an extended bout with rheumatic fever, which led to emotional instability, impulsivity, and impairment of the neurophysiological mechanisms for planning and reasoning."  130 S. Ct. at 389 (internal quotation

22

marks omitted).  Reviewing the issue of prejudice de novo, the Supreme Court held that counsel's failure to introduce this evidence caused no prejudice to Belmontes because any attempt to portray him in a positive light would have "invited the strongest possible evidence in rebuttal," id. at 389, specifically that Belmontes had been suspected of murder before, id. at 385, and because "the cold, calculated nature of the [previous] murder and Belmontes' subsequent bragging about it would have served as a powerful counterpoint" to any evidence that he had acted impulsively when he killed the victim, id. at 389.

Evans's postconviction evidence of mitigation suffers from the same kind of shortcomings that the Supreme Court identified in Belmontes.  The introduction of evidence of Evans's brain injury and resulting impulse control problems would have "invited the strongest possible evidence in rebuttal" including evidence of his antisocial personality disorder and numerous violent outbursts.  See id. at 389.  And evidence that Evans acted impulsively when he killed Johnson would have been countered by his own testimony that he was focused and in control when he killed Johnson, by testimony that Evans had announced his intent to kill Johnson in advance of doing so, and by testimony about Evans's calculated actions to cover up his crime.  In the light of the similarities between this appeal and Belmontes, we cannot conclude that the decision of the Supreme Court of Florida that Evans failed to establish prejudice was so objectively unreasonable that it was "beyond any

23

possibility for fairminded disagreement," Reese, 675 F.3d at 1286 (quoting Richter, 131 S. Ct. at 787), especially when we consider that the decision in Belmontes was on de novo review. See Belmontes, 130 S. Ct. at 386–90.

The reasonableness of the decision of the Supreme Court of Florida is further supported by the decision of the Supreme Court of the United States in Pinholster. There the petitioner argued that the state court had unreasonably applied Strickland by determining that he was not prejudiced when evidence concerning his mental health and "serious substance abuse, mental illness, and criminal problems" among his family members had not been introduced at the penalty phase of his trial. 131 S. Ct. at 1410. After concluding that the failure to present the mental health evidence was not prejudicial because introducing this evidence "would have opened the door to rebuttal by a state expert," the Supreme Court held that the state court could have reasonably concluded that the failure to present the evidence concerning the petitioner's family was not prejudicial because the evidence "was by no means clearly mitigating, as the jury might have concluded that Pinholster was simply beyond rehabilitation." Id.

Evans's postconviction evidence would have been even more likely to lead a jury to conclude that he "was simply beyond rehabilitation" than the evidence in Pinholster. See id. Evans's postconviction evidence established that he had "displayed a long history of behavioral problems and escalating violence." Evans,

24

946 So. 2d at 13.  Evans's behavioral problems and violence led his brother to describe him as "the angriest, most aggressive person [he had] ever met."  And Evans's own experts testified that he "suffered from an uncontrollable rage reaction or impulse disorder as a result of the brain damage."  Id. at 8.  We cannot conclude that the decision of the Supreme Court of Florida that the postconviction evidence "would likely have been more harmful than helpful," id. at 13, was an objectively unreasonable application of federal law when the Supreme Court has concluded that less harmful evidence was "by no means clearly mitigating," Pinholster, 131 S. Ct. at 1410.

The Supreme Court has instructed that we are to determine the arguments supporting the decision of a state court and defer to that decision when "it is possible that fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme Court.]"  Richter, 131 S.C.t at 786.  Our precedents applying this standard hold that it is reasonable to treat the kind of evidence that Evans presented in his postconviction hearing as "a 'two-edged sword.'"  Suggs v. McNeil, 609 F.3d 1218, 1231 (11th Cir. 2010) (quoting Pace v. McNeil, 556 F.3d 1211, 1224 (11th Cir. 2009)).  We have held, for example, that evidence of an "antisocial personality disorder [or] narcissistic personality disorder . . . [is] more harmful . . . than mitigating."  Reed v. Sec'y, Fla. Dep't of Corr., 593 F.3d 1217, 1248 (11th Cir. 2010); see also Suggs, 609 F.3d at

25

1231 (observing that psychopathy "is a trait most jurors tend to look disfavorably upon" (quoting Reed v. State, 875 So. 2d 415, 437 (Fla. 2004))); Cummings, 588 F.3d at 1368 (observing that "a diagnosis of antisocial personality disorder . . . is not mitigating but damaging"); Land v. Allen, 573 F.3d 1211, 1222 (11th Cir. 2009) (observing that petitioner's "history of deception and criminality, which . . . [was] an integral part of [the expert's] diagnosis [of antisocial personality disorder], substantially undercuts any potential benefit her mitigation testimony might have had"); Parker v. Sec'y for Dep't of Corr., 331 F.3d 764, 788 (11th Cir. 2003) (observing that antisocial personality disorder is "a diagnosis the jury might not consider mitigating");. We have held too that evidence of substance abuse "can do as much or more harm than good in the eyes of the jury." Ponticelli, 690 F.3d at 1297 (quoting Crawford v. Head, 311 F.3d 1288, 1321 (11th Cir. 2002)); see also, e.g., Suggs, 609 F.3d at 1231 (observing that evidence of historical drug and alcohol abuse "likely could have caused some jurors to vote in favor of death"); Pace, 556 F.3d at 1224 (observing that "evidence of a defendant's [substance] addiction is often 'a two-edged sword': while providing a mitigating factor, such details may alienate the jury and offer little reason to lessen the sentence"). And we have held that "the indication of brain damage . . . can often hurt the defense as much or more than it can help." Haliburton v. Sec'y for Dep't of Corr., 342 F.3d 1233, 1244 (11th Cir. 2003). We have held too that evidence of

behavioral problems while attending school may be "potentially damaging" and "unfavorable." See Suggs, 609 F.3d at 1231–32. In the light of these precedents, a fairminded jurist could conclude that the decision of the Supreme Court of Florida is consistent with the precedents of the Supreme Court of the United States.

Evans argues that Porter compels the conclusion that the Supreme Court of Florida unreasonably applied Strickland because the court failed to consider or unreasonably discounted mitigation evidence presented in the postconviction proceeding, but we disagree. Porter held that it was unreasonable for a state court to conclude that counsel's failure to present powerful mitigation evidence about his client, a decorated war veteran, was not prejudicial. 130 S. Ct. at 453–54. The Court held that the state court unreasonably discounted the evidence of Porter's military service by reducing the mitigating effect of heroic service to "inconsequential proportions" because of evidence that Porter had gone absent without official leave on more than one occasion, id. at 455, when there was undisputed evidence that it was "not uncommon" for soldiers in Korea to go absent without official leave in Korea because they "became disoriented and separated from [their] unit," id. at 450, and that Porter went absent without official leave after returning to the United States to spend time with his son, id. at 450 n.3. The Court also ruled that it was unreasonable for the Supreme Court of Florida to "discount entirely" the impact that the testimony of Porter's mental health expert

27

might have had on the jury because the state court disagreed with the conclusions of Porter's expert and the trial court had found the state expert more credible. Id. at 455.

Porter does not compel the conclusion that the Supreme Court of Florida failed to consider or unreasonably discounted Evans's postconviction evidence. Nothing in the opinion of the Supreme Court of Florida suggests that the court did not give appropriate mitigating weight to Evans's postconviction evidence. Instead, the decision of the Supreme Court of Florida establishes that the court considered the evidence and concluded that the mitigation evidence "would likely have been more harmful than helpful." Evans, 946 So. 2d at 13.

Evans's argument that the Supreme Court of Florida failed to say enough and instead "assumed the evidence was more harmful than helpful," would require us to decide that the Supreme Court of Florida should have provided a detailed explanation of the mitigating weight given to his postconviction evidence. This approach "smacks of a 'grading papers' approach that is outmoded in the post-AEDPA era." Wright v. Sec'y for Dep't of Corr., 278 F.3d 1245, 1255 (11th Cir. 2002). Even when the mitigating weight given to the postconviction evidence is unclear, we must presume "that state courts know and follow the law." Woodford v. Visciotti, 537 U.S. 19, 24, 123 S. Ct. 357, 360 (2002). Nothing in Porter allows us to "[r]equir[e] state courts to put forward rationales for their decisions so that

28

federal courts can examine their thinking." Wright, 278 F.3d at 1255. Instead, we are required to defer to a state court decision even if the decision "is unaccompanied by an explanation." Richter, 131 S. Ct. at 784.

Judge Martin's dissent argues that the analysis of prejudice by the Supreme Court of Florida is inconsistent with Porter because the Supreme Court of Florida failed to give mitigating weight to the testimony of Evans's mental health experts when it deferred to the credibility determination by the state trial court, but this argument misconstrues both Porter and the decision of the Supreme Court of Florida. The Supreme Court of the United States in Porter did not disapprove of the decision of the Supreme Court of Florida to defer to the credibility determination of the trial court for the purpose of determining that Porter had not established statutory mitigation; the Supreme Court instead reversed the decision of the Supreme Court of Florida to discount entirely, as nonstatutory mitigation, the undisputed expert testimony introduced by Porter about his mental health. As the Court explained, "mental health evidence that does not rise to the level of establishing a statutory mitigating circumstance may nonetheless be considered by the sentencing judge and jury as mitigating." Porter, 130 S. Ct. at 454. The Court concluded that it was "not reasonable to discount entirely the effect" that expert testimony introduced by Porter "regarding the existence of a brain abnormality and cognitive defects . . . might have had on the jury or the sentencing judge." Id. at

29

455. The assertion of Judge Martin's dissent that Porter disapproved deferring to a credibility determination by a state trial court is contrary to the face of the opinion of the Supreme Court of the United States itself. In Porter, "the State's experts [had] identified perceived problems with the tests that [Porter's expert had] used and the conclusions that he [had] dr[awn] from them," id. at 455, but none of the experts "testified that he could . . . rule out a brain abnormality," id. at 451. As a result, the testimony of Porter's expert that Porter suffered from some brain abnormality was undisputed. Porter prohibits a state court from "discount[ing] entirely" the mitigating effect of undisputed testimony offered in mitigation, but Porter does not prohibit a state appellate court from deferring to a credibility determination made by a trial court. Porter, 120 S. Ct. at 454–55. In contrast with Porter, the Supreme Court of Florida acknowledged that the postconviction evidence "established that Evans suffered from mental health problems," Evans, 946 So. 2d at 13, and the court determined that the mitigating effect of this evidence was outweighed by the potential aggravating effect of other evidence introduced during the state postconviction hearing. See id. Nothing in the opinion of the Supreme Court of Florida suggests that the mitigating effect of Evans's mental health problems was "discount[ed] entirely." See Porter, 120 S. Ct. at 455.

Evans also argues that the decision of the Supreme Court in Sears v. Upton, --- U.S. ---, 130 S. Ct. 3259 (2010), establishes that the Supreme Court of Florida

30

failed to understand how the Strickland standard applies in this appeal, but Sears

offers Evans no support for at least three reasons. First, unlike the state court

decision in this appeal, the decision in Sears was not subject to deferential review

under section 2254(d) because the defendant had directly appealed the decision of

the state court on state collateral review. Id. at 3261 n.1. Second, unlike this

appeal, the state court had expressly refused to consider the test for prejudice under

Strickland because it had concluded that the task was "impossible." Id. at 3264.

Third, the Supreme Court in Sears did not hold that Sears's life of crime would

necessarily be considered mitigating when presented to a jury. Instead, the Court

reasoned that "the fact that Sears'[s] brother . . . introduced Sears to a life of crime

. . . would have been consistent with a mitigation theory portraying Sears as an

individual with diminished judgment and reasoning skills." Id. at 3263.

In contrast with Sears, the Supreme Court of Florida considered the

mitigating effect of evidence presented during the postconviction hearing. The

court considered whether there was a reasonable probability that Evans would have

received a different sentence if Evans's counsel had introduced this evidence

during the penalty phase as Sears instructed. See id. And the court concluded that

there was not a reasonable probability that the sentence would have been different

because the evidence "would likely have been more harmful than helpful." Evans,

946 So. 2d at 13. Sears did not foreclose the possibility that a state court could

31

reasonably reach this conclusion, nor did Sears even address a situation in which a court is confronted with evidence that is as harmful as it is helpful. Evans's argument that the decision of the Supreme Court of Florida is unreasonable in the light of Sears fails.

Evans argues that it was unreasonable for the Supreme Court of Florida to conclude that the postconviction evidence was more harmful than helpful because the sentencing court already knew much of the potentially harmful information introduced in the postconviction hearing, but the record establishes otherwise. The sentencing court knew that Evans had a criminal history, but the sentencing court did not know that Evans took pride in his occupation as a "jack boy" who robbed drug dealers. Evans, 946 So. 2d at 7. The sentencing court knew that Evans had committed violent acts in the past, but the sentencing court did not know about Evans's pattern of violence toward women. The sentencing court did not know that Evans had attacked a female student and a female teacher while in school; the sentencing court did not know that Evans had once searched for the mother of one of his children for three days before taking her home and "beating her up and all type of stuff;" and the sentencing court did not know that Evans had "punched his wife in the mouth for calling him another man's name." The sentencing court also did not know that Evans's temperament was so violent and angry that his brother considered him "the angriest, most aggressive person [he had] ever met," and that

32

one of his former teachers and counselors was only "surprised it [had]n't happen[ed] sooner" when she heard that Evans had killed someone. And although the sentencing court knew that Evans had possessed firearms, the court did not know that Evans felt "ready" only when he had a gun, or that he had pulled a gun on his brother.

Judge Martin's dissent argues that the decision of the Supreme Court of Florida that Evans could not establish prejudice involved an unreasonable determination of the facts because the sentencing court was already "generally aware" of all "four types" of evidence that the Supreme Court of Florida identified as more harmful than helpful, Dissenting Op. of Martin, J., at 58, 61, but this argument fails for two reasons. First, to the extent that Judge Martin's dissent argues that the Supreme Court of Florida made an unreasonable determination of the facts because not all of the evidence was "new," her dissent relies on a straw man. Evans, 946 So. 2d at 12–13. The Supreme Court of Florida did not even suggest that all of the potentially aggravating evidence that would have been admitted if Evans had pursued a mental health mitigation theory would have been new to the sentencing court. The Supreme Court of Florida instead explained that "[p]resenting [mental health mitigation] evidence would have resulted in the jury hearing about Evans'[s] aggression towards students and teachers, his aggression towards police officers, his pride in being known as a 'jack-boy' because he robs

33

drug dealers, and his habit of carrying a gun." Id. at 13.  Judge Martin's dissent does not dispute that, in fact, the sentencing court would have heard this evidence, and the Supreme Court of Florida reasonably concluded that this evidence would have been more harmful than helpful.  Second, the evidence presented at the state postconviction hearing, in any event, included new aggravating evidence concerning Evans's background.  The evidence provided new details about Evans's violence toward women, his long pattern of violence toward authority figures, his violent criminal activity, and his belief that he was not "ready" unless he had a gun.  Judge Martin's dissent does not dispute that the sentencing court would have heard this new aggravating evidence.  Judge Martin's dissent instead argues that this new evidence is cumulative because the sentencing court "was already generally aware of" Evans's background.  Dissenting Op. of Martin, J., at 61.  But Judge Martin's dissent does not, and cannot, explain why "general[] aware[ness]" of Evans's violent background renders unreasonable the decision of the Supreme Court of Florida that the evidence from Evans's postconviction hearing, which included both harmful and helpful details about Evans's background, was more harmful than helpful.

The Supreme Court of Florida reasonably concluded that Evans's new mental health theory of mitigation was fraught with peril.  In response to the evidence about brain damage, the state could have elicited testimony from Dr.

34

Carpenter and Dr. McClaren—an expert from each side—that they had "no doubt" that Evans had antisocial personality disorder and from Dr. Dee that Evans probably had antisocial personality disorder. As we have held consistently, "[t]his evidence is potentially aggravating as it suggests that [Evans] has antisocial personality disorder, which is a trait most jurors tend to look disfavorably upon, that is not mitigating but damaging." Suggs, 609 F.3d at 1231 (internal quotation marks and citation omitted). The state could have elicited testimony from all three mental health experts that Evans had historically consumed alcohol and was often violent when he did so. In particular, the state could have elicited testimony from Evans's own expert that "Evans [wa]s diagnosed as a bad dude who commits criminal acts when he's drunk." "This evidence, alone and in combination with the evidence that [Evans] drank . . . before he murdered [Johnson], likely could have caused some jurors to vote in favor of death." Id. at 1231. Although Evans's brain damage is relevant to the extent that it suggests that he has problems controlling his impulses and is less morally culpable for his actions, Evans's own testimony proves that he was in control when he murdered Johnson. Evans admitted that, although he had been drinking, he had a "clear recollection of what happened" and he "knew what was going on." The evidence also established that before he committed the murder, Evans had attempted to avoid law enforcement. Evans conceded that he was "perfectly aware of everything" and was "functioning fine."

35

The Supreme Court of Florida reasonably concluded that Evans's new mental health theory of mitigation "would have opened the door to damaging evidence." Cummings, 588 F.3d at 1367 (internal quotation marks omitted). If evidence of Evans's behavioral problems both in school and after had been introduced, a sentencing court would have heard about Evans's long history of violence toward authority figures like the police and teachers. If evidence of Evans's lack of impulse control had been introduced, a sentencing court would have heard of Evans's violence toward women. If evidence of Evans's difficulty controlling aggression had been introduced, a sentencing court would have heard damaging testimony by Evans's own brother that Evans "had a very bad temper problem" and was "the angriest, most aggressive person [he had] ever met." If evidence of Evans's escalating pattern of aggression while in school had been introduced, a sentencing court would have heard the chilling observation of Evans's former school counselor that she "felt with all [her] heart that [Evans] was capable of very great violence," and that she believed that Evans was even more dangerous than the other children in the emotionally disturbed program. If evidence of Evans's difficulty complying with the law had been introduced, a sentencing court would have heard about Evans's affinity for guns, his penchant for robbing drug dealers, and his use of crack cocaine. If evidence that Evans's behavioral problems had been caused by his childhood had been introduced, a

36

sentencing court would have also heard Evans's own denial that his childhood had anything at all to do with his life of crime.  In the light of the wealth of new potentially harmful evidence introduced at the postconviction hearing, "[i]t is reasonable to doubt that, taken as a whole, [the new] evidence would have impressed a [sentencing court]." Suggs, 609 F.3d at 1230.

## IV.  CONCLUSION

The denial of Evans's petition for a writ of habeas corpus is **AFFIRMED.**

JORDAN, Circuit Judge, concurring.

I concur in Judge Pryor's opinion for the Court. I write to address an assertion by the Secretary which I believe to be mistaken and which, if accepted, will cause unnecessary analytical problems in the future.

## I

The Secretary insists that, when evaluating an ineffective assistance of counsel claim under 28 U.S.C. § 2254(d), we must apply a doubly deferential standard of review to the performance *and* prejudice prongs under *Strickland v. Washington*, 466 U.S. 668 (1984). *See* Appellee's Initial Br. at 12; Appellee's *En Banc* Br. at 13.  As explained below, however, double deference does not apply to the prejudice inquiry.

Where the performance prong of *Strickland* is concerned, habeas review is indeed doubly deferential. *See, e.g.*, *Yarborough v. Gentry,* 540 U.S. 1, 6 (2003) ("Judicial review of a defense attorney's summation is . . . highly deferential—and doubly deferential when it is conducted through the lens of federal habeas."). This is because, as the Supreme Court told us in *Strickland*, counsel's performance is itself due a base level of deference: "Judicial scrutiny of counsel's performance must be highly deferential." 466 U.S. at 689. When we layer the "deferential lens of § 2254(d)" atop that first level of deference, the end result is "doubly

deferential" review of counsel's performance. *See Knowles v. Mirzayance*, 556 U.S. 111, 121 n.2, 123 (2009).

This case, however, involves only the prejudice prong of *Strickland*, and with respect to that prong there is no underlying deference. Unlike the performance evaluation, which asks us to assess what counsel did or did not do, *see Strickland*, 466 U.S. at 688 (explaining that the measure of attorney performance under the Sixth Amendment is "reasonableness under prevailing professional norms"), the prejudice question is, in the end, a legal one. There is no "what" to analyze. There is only the ex post legal determination, by a court based on a hypothetical construct with counsel's errors corrected, as to whether the defendant was or was not prejudiced by his counsel's actions or omissions. *See, e.g., Wiggins v. Smith,* 539 U.S. 510, 534 (2003) (to determine whether prejudice resulted from counsel's deficient performance at a capital sentencing hearing, a court must "reweigh the evidence in aggravation against the totality of available mitigating evidence"); *Lockhart v. Fretwell,* 506 U.S. 364, 372 (1993) (the prejudice inquiry "focuses on the question whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair").  It therefore makes no sense to say that initial judicial review as to whether prejudice resulted from counsel's deficient performance—on its own, before adding AEDPA deference—involves any deference.  We give deference on habeas to a state court's ruling on prejudice

under § 2254(d), but that is the only deference involved.  *See Ruiz v. Sec'y, Fla. Dep't of Corr.*, 439 F. App'x 831, 835 (11th Cir. 2011) ("Analyzing a claim of ineffective assistance under § 2254(d) adds a 'double layer' of deference *to counsel's performance*.") (emphasis added); *Bowling v. Haeberlin,* ___ F. Supp. 2d ___, 2012 WL 4498647, at *6 (E.D. Ky. Sept. 28, 2012) (prejudice review "is not doubly deferential like the performance inquiry").

## II

There is language in some Supreme Court and Eleventh Circuit opinions suggesting that doubly deferential review applies to the prejudice prong. *See Cullen v. Pinholster,* 131 S. Ct. 1388, 1403 (2011) ("Our review of the California Supreme Court's decision [as to performance and prejudice] is . . . doubly deferential."); *Frazier v. Bouchard*, 661 F.3d 519, 534 (11th Cir. 2011) ("Bearing in mind the 'doubly' deferential nature of *Strickland* review under AEDPA, we cannot hold that Frazier has made the requisite showing of prejudice.") (citation omitted); *Pooler v. Sec'y, Fla. Dep't of Corr.*, ___ F.3d ___, 2012 WL 6555012, at *17 (11th Cir. Dec. 17, 2012) ("Because we must view Pooler's ineffective assistance of counsel claim—which is governed by the deferential *Strickland* test—through the lens of AEDPA deference, the resulting standard of review is 'doubly deferential.'").   But there is a strong argument that such language is dicta,

40

for neither the Supreme Court nor this Circuit has actually applied double deference to the question of prejudice.

*Cullen*, *Frazier,* and *Pooler* used straight-forward single-deference AEDPA review as to the state court's ruling on prejudice, without ever explaining how doubly deferential review would actually work with respect to prejudice.  *See Cullen*, 131 S. Ct. at  1410 ("Given what little additional mitigating evidence Pinholster presented in state habeas, we cannot say that the California Supreme Court's determination [of no prejudice] was unreasonable."); *Frazier,* 661 F.3d at 533 ("Given the availability of an additional, highly prejudicial aggravating circumstance, we simply cannot say that, but for the failure of Frazier's counsel to investigate and present additional mitigating evidence to the sentencing jury, 'there is a reasonable probability that . . . the result of the proceeding would have been different.'") (quoting *Strickland*, 466 U.S. at 694); *Pooler,* 2012 WL 6555012, at *22 ("[W]e conclude that the Florida Supreme Court's decision that Pooler did not satisfy *Strickland*'s prejudice prong was not contrary to Supreme Court precedent, did not unreasonably apply Supreme Court precedent, and was not based on an unreasonable determination of the facts in light of the state-court evidence."). Because the mere articulation (and repetition) of a legal standard, without actual application of that standard, can amount to dicta, *see Bd. of Trustees of State Univ. of New York v. Fox,* 492 U.S. 469, 476-77 (1989), the opinions in *Cullen*, *Frazier,*

41

and *Pooler* may not constitute binding precedent mandating doubly deferential prejudice review.  *See Seminole Tribe of Florida v. Florida,* 514 U.S. 44, 67 (1996) ("When an opinion issues for the Court, it is not only the result but also those portions of the opinion necessary to that result by which we are bound."); *United States v. Kaley,* 579 F.3d 1246, 1253 n.10 (11th Cir. 2009) ("[D]icta is defined as those portions of of an opinion that are not necessary to deciding the case[.]") (internal quotation marks and citations omitted); P. Leval, *Judging Under the Constitution: Dicta About Dicta*, 81 N.Y.U.  L. Rev. 1249, 1256 (2006) ("A dictum is an assertion in a court's opinion of a proposition of law which does not explain why the court's judgment goes in favor of the winner.  If the court's judgment and the reasoning which supports it would remain unchanged, regardless of the proposition in question, that proposition plays no role in explaining why the judgment goes for the winner.").

If the "doubly deferential" articulations in *Cullen, Frazier,* and *Pooler* do constitute holdings as to the prejudice prong, then the standard apparently exists in name only.  As explained above, in practice doubly deferential prejudice review is identical to (and no more demanding than) single-deference AEDPA prejudice review.  A couple of examples help illustrate the point.  Imagine that a court says in an opinion that the applicable standard of review is "heightened abuse of discretion," but then conducts run-of-the-mill (and non-heightened) abuse of

42

discretion review, or says that the applicable standard of review is "super clearly erroneous review," but then conducts traditional (and no more demanding) clear error review.  In both of these scenarios, as here, a later court would be justified in concluding that the articulation of the new standard of review constituted dicta, or that the new standard, in practice, was no different from the previously accepted (and more familiar) standard.

I acknowledge that some courts and judges have required or called for doubly deferential prejudice review explicitly. *See, e.g.*, *Foust v. Houk*, 655 F.3d 524, 534 (6th Cir. 2011) ("We therefore afford double deference to . . . both prongs of the *Strickland* test."); *Elmore v. Ozmint*, 661 F.3d 783, 876 (4th Cir. 2011) (Wilkinson, J., dissenting) ("[C]ourts regularly apply the 'doubly deferential' standard of Strickland and AEDPA to both the performance and prejudice prongs. This makes good sense.") (citations omitted).  Yet those who have done so have likewise failed to explain why it is legally appropriate or where the initial level of deference comes from. Nor have they told us how to go about giving it. Instead, despite purporting to apply double deference, they too have carried out the prejudice inquiry in the traditional, single-deference, AEDPA manner for capital sentencing proceedings: by evaluating whether the state court, after weighing the totality of mitigation and aggravation evidence to determine if there is a reasonable probability of a different result, reached a conclusion that is reasonable in light of

43

clearly established Supreme Court precedent. *See, e.g.*, *Foust*, 655 F.3d at 538-39; *Elmore*, 661 F.3d at 876 (Wilkinson, J., dissenting). These deficiencies indicate that the phrase "doubly deferential," while easy on the ear, is difficult on the pen when it comes to prejudice.

One might ask why any of this matters. After all, if a state court's ruling on prejudice is going to be upheld as reasonable under AEDPA single deference, what difference does it make to say that a federal court is applying "doubly deferential" review? The danger is not in the great majority of cases, where state court rulings on prejudice are going to viewed as reasonable, but rather in those where a federal court, after applying AEDPA deference, nevertheless concludes that a state court ruling on prejudice is unreasonable within the meaning of § 2254(d). In such cases, the erroneous notion that there is another level of deference out there somewhere may tip the scales and work to deny relief to deserving habeas petitioners.

Unwarranted consequences can result when a "phrase takes on a life of its own, and before too long, . . . starts being applied to situations . . . removed from its intended and proper context." *Tice v. Am. Airlines, Inc.*, 162 F.3d 966, 970 (7th Cir. 1999). As Justice Cardozo, in a paraphrase of Justice Holmes, cautioned: "The repetition of a catchword can hold analysis in fetters for fifty years and more."

Benjamin N. Cardozo, *Mr. Justice Holmes*, 44 HARV. L. REV. 682, 689 (1931). These concerns, in my view, apply with full force here.

## III

Standards of review are critical to the business of judging, and can often be outcome-determinative. My hope, in writing separately, is to suggest that we should not blindly assume that the concept of doubly deferential review applies to the question of prejudice in habeas cases. If we subject the assumption to rigorous examination now, we will see that it is mistaken, and can then unfetter the analysis of *Strickland* prejudice for the many habeas litigants and courts to come.

WILSON, Circuit Judge, dissenting:

The original panel, of which I was a part, held that Evans met AEDPA's standard for habeas relief under *Strickland* because his trial counsel presented absolutely no mental health mitigating evidence at sentencing and wholly failed to conduct a meaningful investigation into Evan's background. As a result, Evans was sentenced to death without the jury and the sentencing judge having all of the facts essential to the deliberative process. *Evans*, 681 F.3d at 1254–70 . I disagree with the majority's conclusion to the contrary. I write separately, however, to express my reservation about the decision by the Court to take this case en banc in the first place. A majority of the active judges in regular service on the Court voted to reconsider this appeal en banc. As a result, we are faced with a majority opinion that essentially amounts to a mere disagreement with the original panel opinion. En banc review was not "necessary to secure or maintain uniformity of the court's decisions," nor does this appeal concern "a question of exceptional importance." Fed. R. App. P. 35(a). The Rule says that if neither of these conditions are met, en banc review is "not favored and ordinarily will not be ordered." *Id.*

Our rules of appellate procedure urge restraint in invoking the en banc mechanism, providing that rehearing en banc should be granted only when necessary "to secure or maintain uniformity of [our] decisions" or when "the

46

proceeding involves a question of exceptional importance." Fed. R. App. P. 35(a); *see Boxer X v. Harris*, 459 F.3d 1114, 1115 (11th Cir. 2006) (en banc) (Carnes, J., concurring in the denial of rehearing en banc); *see also* Fed. R. App. P. 35(b) advisory committee's note (explaining not once, but twice, that Rule 35(a) is intended to embody "rigid standards"). En banc resolution of the case before us is not necessary to secure uniformity of our decisions. Though the majority might suggest otherwise, its only quarrel is with the *application* of agreed-upon precedents to the facts at hand. So too with Judge Edmonson's dissent to the original panel opinion. *See Evans*, 681 F.3d at 1272 (Edmonson, J., dissenting) (noting that the majority, applying *Strickland* and its progeny, simply "reached a different conclusion" than he would have reached on the facts). Yet in such a case, Eleventh Circuit Rule 35-3, our companion to Federal Rule of Appellate Procedure 35, explicitly provides: "Alleged errors in a panel's determination of state law, or in the facts of the case . . . , or error asserted *in the panel's misapplication of correct precedent to the facts of the case*, are matters for rehearing before the panel *but not for en banc consideration*." 11th Cir. R. 35-3 (emphasis supplied).

Nor does this appeal involve "a question of exceptional importance." Fed. R. App. P. 35(a)(2); *see United States v. Blaylock*, 275 F.3d 1030 (11th Cir. 2001) (en banc) (Carnes, J., concurring) ("En banc rehearing is 'an extraordinary procedure' intended for correction of 'precedent-setting error[s] of exceptional

47

importance.'" (quoting 11th Cir. R. 35-3)).  There is nothing about Evans's ineffective assistance of counsel claim that takes it out of the ordinary, run-of-the-mill such claims that we see, regrettably, so often in this circuit.  I believe that every death case is *important*, but that does not mean that every *issue* presented in a death case is necessarily one of exceptional importance.

This appeal presents no novel question of law.  The panel opinion disturbs no settled rule of law nor impugns the continued validity of any previous Eleventh Circuit or Supreme Court decision.  *See Watson v. Geren*, 587 F.3d 156, 158 (2d Cir. 2009) (per curiam) (Pooler, Katzmann, B.D. Parker, Wesley, and Hall, J.J., concurring in the denial of rehearing en banc) ("Given that the panel's decision does not seek to depart from existing standards, the issue presented by this appeal is not properly considered a 'question of exceptional importance' within the meaning of Federal Rule of Appellate Procedure 35(a)(2).").  In cases such as these, we must be mindful that "the collective wisdom of the federal judiciary is that en banc review must be soundly justified, else the game will not be worth the candle."  *Church of Scientology of Cal. v. Foley*, 640 F.2d 1335, 1342 (D.C. Cir. 1981) (Robinson, J., dissenting, joined by Edwards and Ginsburg, J.J.).  No such sound justification is present here.  Further,

> [c]ontrary to the view one must perforce infer from the court's decision today, the en banc court is not an institution for monitoring panel decisionmaking; it flies in the face of both the intent of

48

Congress and Supreme Court precedent to use the Rule 35 procedure merely to correct individual injustices or mistakes.

*Id.* at 1241 (Robinson, J., dissenting, joined by Edwards and Ginsburg, J.J.) (internal quotation marks omitted); *see E.E.O.C. v. Ind. Bell Tel. Co.*, 256 F.3d 516, 529 (7th Cir. 2001) (en banc) (Posner, J., concurring) (noting that "we do not take cases en banc merely because of disagreement with a panel's decision, or rather a piece of a decision"); *see also Hart v. Massanari*, 266 F.3d 1155, 1172 n.29 (9th Cir. 2001) (Kozinski, C.J.) ("Because they are so cumbersome, en banc procedures are seldom used merely to correct the errors of individual panels . . . .").

Disagreement with the panel opinion in a given case is simply insufficient to merit en banc review. If mere disagreement among federal judges on a particular issue were the touchstone of en banc review, nary a single opinion would see the light of day. *Cf. Foley*, 640 F.2d at 1341 (Robinson, J., dissenting, joined by Edwards and Ginsburg, J.J.) ("[T]he courts agree that the availability of en banc rehearings to cure intra-circuit conflicts does not justify a vote for reconsideration by the entire court merely because (a judge) disagrees with the result reached by the panel." (internal quotation marks omitted)). Our appellate rules were judiciously crafted with exactly that consideration in mind.

MARTIN, Circuit Judge, dissenting:

I respectfully dissent.  The majority opinion goes to great lengths to demonstrate that Wydell Evans is a dangerous person who committed a horrific crime.  I have no quarrel with this description.  I am writing in dissent, however, because federal habeas principles apply to even those among us who deserve the harshest punishment.  To my mind, it is in those cases that the principles underlying the Great Writ matter most.  Applying those principles, and giving the deference to the Florida Supreme Court that it is certainly due, I have concluded that Mr. Evans is entitled to federal habeas relief.  Our Supreme Court has interpreted the U.S. Constitution to guarantee a prisoner facing a death sentence a real investigation into his own life, so that a jury can know any facts that might weigh against putting him to death.  Mr. Evans's jury never knew the result of any such investigation, because it had not been done at the time they heard the case.  Now that an investigation has been done, the facts it turned up could have reasonably inclined the jury to sentence Mr. Evans to something other than death.

The majority has affirmed the District Court's denial of habeas relief to Mr. Evans, reciting the fact that the Florida Supreme Court's decision is entitled to deference under the Antiterrorism and Effective Death Penalty Act (AEDPA).  See 28 U.S.C. § 2254(d).  It is certainly true that AEDPA imposes a standard that is "difficult to meet" for a state prisoner seeking the writ of habeas corpus based on

50

ineffective assistance of counsel, where that claim was denied on the merits by the state court. See Harrington v. Richter, __U.S.__, __,131 S. Ct. 770, 786 (2011). The majority opinion turns on the reasonableness of the Florida Supreme Court's conclusion that "Evans had failed to prove prejudice because his postconviction evidence of mitigation was more harmful than helpful." Maj. Op. at 3; see also Evans v. State, 946 So. 2d 1, 13 (Fla. 2006). I have concluded to the contrary that the Florida Supreme Court's findings in this regard constituted an unreasonable determination of the facts in light of the evidence that came to light after Mr. Evans was sentenced to death.

The majority emphasizes the bad things brought out about Mr. Evans during the state court evidentiary hearing that likely would have been told to the jury if he had presented a mental health defense. Again, I do not question that presentation of a mental health defense likely would have resulted in the jury hearing bad things about Mr. Evans, including some evidence his jury never heard. And I certainly recognize that the facts and circumstances the jury heard about Mr. Evans's shooting of Angel Johnson, together with his despicable conduct after he shot her, were not mitigating. But I do part ways with my colleagues as to whether the Florida Supreme Court's prejudice analysis under Strickland was reasonable and entitled to deference under AEDPA.

As I have said, I find the Florida Supreme Court's decision rejecting Mr. Evans's claim of ineffective assistance of counsel during the penalty phase of his trial to be based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Separately, I have also concluded that the Florida Supreme Court's decision involved an unreasonable application of the prejudice analysis required by Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984). Once the state court unreasonably applies Strickland, or unreasonably determines the facts, its analysis is not entitled to deference under 28 U.S.C. § 2254(d). I have therefore conducted a de novo review, and concluded that Mr. Evans has demonstrated "there is a reasonable probability that, absent [counsel's deficient performance], the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Strickland, 466 U.S. at 695, 104 S. Ct. at 2069.

## I.

Like the Florida Supreme Court, the majority for this Court does not decide whether the acts and omissions of Mr. Evans's lawyer constituted deficient performance under Strickland. Instead, this Court's majority has affirmed the denial of habeas relief based on its conclusion that the Florida Supreme Court's analysis that Mr. Evans was not prejudiced by his lawyer's failure to tell the jury about late discovered "mitigating" evidence is entitled to deference. This approach

of addressing only one of the two inquiries required by <u>Strickland</u> for a finding that counsel was ineffective is, of course, well established habeas practice and helps conserve judicial resources.  See <u>Strickland</u>, 466 U.S. at 697, 104 S. Ct. at 2069. <u>Strickland</u>'s deficiency and prejudice components involve very separate and distinct inquiries.  Insofar as they did not address it, I do not understand the majority opinion to have decided the <u>Strickland</u> deficiency component one way or the other.  However, I think some description of counsel's deficient performance is necessary to fully address the question of whether Mr. Evans was prejudiced by that performance.

For context, I begin with the undisputed proposition that our system does not allow a person to face a sentence of death without someone having looked into his background.  "It is unquestioned that under the prevailing professional norms at the time of [Evans's 1999] trial, counsel had 'an obligation to conduct a thorough investigation of the defendant's background.'"  <u>Porter v. McCollum</u>, 558 U.S. 30, ___, 130 S. Ct. 447, 452–53 (2009) (quoting <u>Williams v. Taylor</u>, 529 U.S. 362, 396, 120 S. Ct. 1495, 1515 (2000) (citing 1 ABA Standards for Criminal Justice 4-4.1, commentary, p. 4–55 (2d ed. 1980))).  The Supreme Court has further instructed that under <u>Strickland</u>, "our principal concern . . . is not whether counsel should have presented" mitigating evidence, but rather "whether the investigation supporting counsel's decision not to introduce mitigating evidence of [the

defendant's] background was itself reasonable." Wiggins v. Smith, 539 U.S. 510, 522–23, 123 S. Ct. 2527, 2536 (2003) (emphasis omitted).

For Mr. Evans, his trial counsel did little mitigation investigation. Perhaps worse, he formulated his "strategy" to put on a penalty phase defense that Mr. Evans had good character even before what little bit of investigation he did do. Indeed, we now know from the state evidentiary hearing, held after Mr. Evans was sentenced to death, that his trial counsel understood at the time he represented Mr. Evans, that "non-statutory mitigation was" limited to good character evidence.

In preparing for his mitigation case, counsel asked few questions of Mr. Evans's family, relying mainly on a brief, thirty-minute interview of Evans's mother, Lilly. Even from the beginning, counsel instructed her to say only good things about her son and his background.[1] He did ask Lilly to collect character witnesses for her son's trial, but she understood that counsel wanted only "people that could say some good things about" Mr. Evans. Counsel then sent form letters, rather than individualized inquiries, to solicit character witnesses.[2] He did not

---

[1] The American Bar Association (ABA) guideline that existed at the time advised counsel to "explore the existence of other potential sources of information relating to the offense, the client's mental state, and the presence or absence of any aggravating factors under the applicable death penalty statute and any mitigating factors." Id. § 11.4.1(D)(2)(B).

[2] The form letter was as follows:
    Dear [X]:
    Your name and address was provided to me by Lilly Evans, as a possible character witness for her son, Wydell Jody Evans, with regard to charges of First Degree Murder.
        Would you please indicate, in your own words, the following:

collect basic background materials that would have been easy to get, such as Mr. Evans's school and medical records.[3]  This was all in the face of ABA Guideline § 11.4.1 from 1989—reflecting prevailing professional norms ten years before Mr. Evans's trial—which provides that counsel's "investigation should comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor."  ABA Guideline § 11.4.1(C).

Because counsel conducted no mitigation investigation beyond Mr. Evans's good character, he never learned that Mr. Evans was hit by a car at age three, suffering a closed head injury with resulting brain damage, learning disabilities, emotional handicaps, and impulse control problems, all of which were significant enough by the time Mr. Evans was seven years old, to warrant a psychological assessment by public school authorities.

1. How long you have known Wydell Jody Evans;
2. How to [sic] you know Wydell Jody Evans – as a
   a. friend;
   b. family member;
   c. co-worker;
   d. employee;
   f. employer.
3. In one or two sentences please indicate what you think of Wydell Jody Evans as a person and whether or not you feel he committed the crime for which he has been charged.

[3] No competent counsel in 1999 would have failed to collect and review this type of information especially where, as here, the defendant was a lifelong resident of the county where the trial was held. See ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases (1989), cited in Wiggins, 539 U.S. at 524, 123 S. Ct. at 2536–37.

55

Counsel also unreasonably failed to follow up on the limited background information he did have. For example, the Florida Supreme Court noted that trial counsel "testified that the presentence investigation reports (PSI) from Evans'[s] prior convictions indicated that his mental health was perfect <u>and that he had only seen a mental health expert when he was young</u>." <u>Evans</u>, 946 So. 2d at 9 (emphasis added). While the state courts emphasized that Mr. Evans had reported "perfect" mental health in his PSI reports, it is also true that the PSIs reported that he had "seen a mental health expert when he was young." <u>Id.</u> This information should have been a red flag to trial counsel, alerting him to the need to conduct a follow-up investigation. <u>See</u> <u>Rompilla</u>, 545 U.S. at 392, 125 S. Ct. at 2468–69. No competent counsel in 1999 would have failed to follow-up on information of this kind. Prompted by this red flag, competent counsel would have then obtained and reviewed school and medical records, for example. Then armed with these records, competent counsel would have investigated Mr. Evans's mental health and consequently discovered his history of brain damage.

In sum, Mr. Evans's trial counsel's performance was deficient because he stopped his investigation too early, before he completed the kind of thorough investigation contemplated by <u>Wiggins</u> and then-prevailing professional norms. <u>See</u> <u>Sears v. Upton</u>, __U.S. __, __, 130 S. Ct. 3259, 3264 (2010) (agreeing with state court's determination that the "the cursory nature of counsel's investigation

56

into mitigation evidence—'limited to one day or less, talking to witnesses selected by [defendant's] mother'—was 'on its face . . . constitutionally inadequate'" (citation omitted)). Counsel's decision to focus his investigation on Mr. Evans's good character was not an informed decision based upon a constitutionally adequate investigation. As in Wiggins, and in breach of well-defined norms in existence at the time of Mr. Evans's 1999 penalty phase, Mr. Evans's trial counsel "abandoned [his] investigation of [Evans's] background after having acquired only rudimentary knowledge of his history from a narrow set of sources." Wiggins, 539 U.S. at 524, 123 S. Ct. at 2537. Although counsel's decision to focus on good character evidence might be "reasonable, in the abstract, [it] does not obviate the need to analyze whether counsel's failure to conduct an adequate mitigation investigation before arriving at this particular theory prejudiced" the defendant. Sears, 130 S. Ct. at 3265. "Whether or not [trial counsel's] omissions were sufficiently prejudicial to have affected the outcome of sentencing, they clearly demonstrate that trial counsel did not fulfill [his] obligation to conduct a thorough investigation of the defendant's background." Williams, 529 U.S. at 396, 120 S. Ct. at 1514–15.

## II.

I will now set out how I came to conclude that the Florida Supreme Court's ruling on the prejudice prong of Mr. Evans's penalty phase ineffective assistance

57

of counsel claim involved an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. See 28 U.S.C. § 2254(d)(2). The error is plain from the Florida Supreme Court's decision, where it stated:

> Evans has failed to establish prejudice because the mitigation evidence he presented at the evidentiary hearing would likely have been more harmful than helpful. An ineffective assistance claim does not arise from the failure to present mitigation evidence where that evidence presents a double-edged sword. While the testimony presented at the evidentiary hearing established that Evans suffered from mental health problems, it also displayed a long history of behavioral problems and escalating violence throughout his school career. Presenting this evidence at the penalty phase would have resulted in the jury hearing about Evans'[s] aggression towards students and teachers, his aggression towards police officers, his pride in being known as a "jack-boy" because he robs drug dealers, and his habit of carrying a gun. It is just as likely that this evidence would have been more "aggravating" than mitigating.

Evans, 946 So. 2d at 13 (some quotation marks omitted). This decision specifies four types of evidence that the jury would have heard if Mr. Evans had presented a mental health defense: (1) "aggression towards police officers;" (2) "pride in being known as a 'jack-boy'" and robbing drug dealers; (3) habit of carrying a gun; and (4) "aggression towards students and teachers." This is an unreasonable determination of the facts, because Mr. Evans's jury already heard much of this evidence—some of it from Mr. Evans's own mouth, when he testified at both the guilt and sentencing phases of his trial.

For example, the jury was already well aware of Mr. Evans's "aggression towards police officers." Certified copies of his two prior convictions for battery

on law enforcement officers were introduced into evidence during the penalty phase of his trial. This was augmented by portions of the presentence investigation reports from these prior convictions, describing the battery convictions, which were also admitted into evidence during the penalty phase. Finally, Mr. Evans himself described from the witness stand his batteries against law enforcement officers, telling the jury that he kicked a police officer in his private parts in one incident, and struck an officer in the throat in another.

The penalty phase jury also knew that Mr. Evans was known to carry a gun. A certified copy of his prior felony conviction for possession a firearm was admitted into evidence during his penalty phase. Also, Mr. Evans testified before the same jury during his guilt phase, that he knew how to operate firearms. Notably, the same jury had already convicted him of first-degree murder for shooting Angel Johnson.

While the jury did not hear in precisely the same terms about Mr. Evans's violence in school; that he robbed drug dealers; or that he prided himself on being known as "jack-boy," the jury was well aware of his violent tendencies. The jury knew that Mr. Evans had six felony convictions, including the violent felonies for battery on a law enforcement officer discussed above, as well as aggravated battery. Mr. Evans testified to the jury that he had difficulties in his later school years, including skipping school and being suspended. Indeed, Mr. Evans told the

59

jury that he dropped out of school in tenth grade because he was involved in crime. He described his activities as "thuddin'." He also told them that he was already in prison by the time he should have graduated high school.

To the extent the postconviction aggravating evidence is just more of the aggravating evidence the jury already knew about Mr. Evans's background, it is not reasonable to find Mr. Evans's new mental health mitigation "more harmful than helpful." The Florida Supreme Court's determination that the postconviction mitigation evidence presented a "double-edged sword" is objectively unreasonable because it fails to recognize the fact that the jury was already well-acquainted with the aggravating edge of the sword, when the same was not true of the mitigating edge. The point of Strickland's prejudice analysis is to reweigh all of the aggravating and mitigating evidence to see if there is a reasonable probability the jury would have returned a different sentence. Mr. Evans's case is the mirror image of the Strickland analysis often done by our Court and the Supreme Court, in which no prejudice is found because the petitioner's postconviction mitigation evidence is cumulative of the mitigating evidence the jury already knew about.[4]

_____

[4] See, e.g., Cullen v. Pinholster, __ U.S. __, __, 131 S. Ct. 1388, 1409 (2011) (finding no reasonable probability that the additional evidence presented in state habeas proceeding would have changed jury's verdict because the "'new' evidence largely duplicated the mitigation evidence at trial"); Wong v. Belmontes, 558 U.S. 15, __, 130 S. Ct. 383, 387 (2009) (finding no prejudice in part where "[s]ome of the evidence was merely cumulative of the humanizing evidence . . . actually presented [at trial]; adding it to what was already there would have made little difference"); Holsey v. Warden, Ga. Diagnostic Prison, 694 F.3d 1230, 1271 (11th Cir. 2012) ("The cumulative nature of [the mitigating] evidence weakens its usefulness to [the capital

Here, the postconviction aggravating evidence was mostly cumulative to the evidence presented at the penalty phase but the powerful mitigating evidence was not.

Because the Florida Supreme Court's prejudice determination rested, in part, on an unreasonable determination of the facts—that the mitigating evidence was more harmful than helpful because it would have resulted in the jury learning facts it was already generally aware of—its ruling on prejudice is not entitled to deference under AEDPA.  We have explained:

> When a state court's adjudication of a habeas claim results in a decision that is based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding, this Court is not bound to defer to unreasonably-found facts or to the legal conclusions that flow from them.  When a state court unreasonably determines the facts relevant to a claim, we do not owe the state court's findings deference under AEDPA, and we apply the pre–AEDPA de novo standard of review to the habeas claim.

---

habeas petitioner] on the prejudice inquiry."); Sochor v. Sec'y, Dep't of Corr., 685 F.3d 1016, 1031(11th Cir. 2012) (finding no prejudice in part because "[m]ost of the nonstatutory mitigating evidence that [petitioner] produced in the evidentiary hearing was cumulative of evidence produced at the guilt and penalty phases of the trial"); Rose v. McNeil, 634 F.3d 1224, 1243 (11th Cir. 2011) ("[A] petitioner cannot satisfy the prejudice prong of the Strickland test with evidence that is merely cumulative of evidence already presented at trial"); Boyd v. Allen, 592 F.3d 1274, 1298 (11th Cir. 2010) (holding no prejudice in part because "much (although not all) of the 'new' testimony introduced at the post-conviction hearing would simply have amplified the themes already raised at trial"); Robinson v. Moore, 300 F.3d 1320, 1347 (11th Cir. 2002) (holding no prejudice where "most of the new mitigation evidence [was] cumulative of the nonstatutory mitigating circumstances presented during resentencing"); id. ("While the additional mitigation witnesses procured by Robinson's 3.850 counsel could have presented the resentencing jury and trial judge with more details, or different examples, of these aspects of Robinson's life, these aspects of his life were nonetheless known to the resentencing jury and trial judge."); Glock v. Moore, 195 F.3d 625, 636 (11th Cir. 1999) (concluding that capital petitioner could not show prejudice because "much of the new evidence that [petitioner] presents is merely . . . cumulative to that which was presented at trial").

61

Cooper v. Sec'y, Dep't of Corr., 646 F.3d 1328, 1353 (11th Cir. 2011) (quotation marks and alteration omitted). Thus it is our obligation to determine de novo whether Mr. Evans was prejudiced by the failure of his counsel to present the mitigating evidence which has since come to light.[5]

## III.

There is another reason why the Florida Supreme Court's ruling on Mr. Evans's penalty phase ineffective assistance of counsel claim is not entitled to deference under AEDPA. I believe that the Florida Supreme Court unreasonably applied Strickland's prejudice standard. See 28 U.S.C. § 2254(d)(1). This is because that Court's prejudice analysis suffers from the same infirmity the U.S. Supreme Court identified and repudiated in Porter v. McCollum, 130 S. Ct. 447.

In Porter v. McCollum, the U. S. Supreme Court found the Florida Supreme Court's analysis of a capital habeas petitioner's penalty phase Strickland claim to be "an unreasonable application of our clearly established [federal] law." 130 S. Ct. at 455. The U.S. Supreme Court reversed the ruling in Porter v. State, 788 So. 2d 917, where the Florida Supreme Court affirmed the trial judge's ruling in which he gave greater weight to the expert who testified for the State of Florida than the expert presented by Mr. Porter. Stating that the trial court had "resolved the

---

[5] The state trial court's conclusion that trial counsel made a strategic decision to present only good character evidence, despite counsel's lack of investigation, is the same kind of "post hoc rationalization" rejected in Wiggins. Wiggins, 539 U.S. at 526– 27, 123 S. Ct. at 2538.

conflict of the expert opinion" and "concluded that [Porter] failed to demonstrate the existence of the alleged mitigation," the Florida Supreme Court affirmed the state trial court's conclusion that there was no prejudice under Strickland.  Id.  at 923–24 (citing Stephens v. State, 748 So. 2d 1028, 1034 (Fla. 1998)).[6]

In Porter v. McCollum, the United States Supreme Court rejected this analysis as an unreasonable application of Strickland:

> The Florida Supreme Court's decision that Porter was not prejudiced by his counsel's failure to conduct a thorough—or even cursory—investigation is unreasonable.  The Florida Supreme Court either did not consider or unreasonably discounted the mitigation evidence adduced in the postconviction hearing. Under Florida law, mental health evidence that does not rise to the level of establishing a statutory mitigating circumstance may nonetheless be considered by the sentencing judge and jury as mitigating.  See, e.g., Hoskins v. State, 965 So. 2d 1, 17–18 (Fla. 2007) (per curiam).  Indeed, the Constitution requires that "the sentencer in capital cases must be permitted to consider any relevant mitigating factor."  Eddings v. Oklahoma, 455 U.S. 104, 112, 102 S. Ct. 869 (1982).  Yet neither the postconviction trial court nor the Florida Supreme Court gave any consideration for the purpose of nonstatutory mitigation to Dr. Dee's testimony regarding the existence of a brain abnormality and

---

[6] In Stephens v. State, 784 So. 2d 1028, the Florida Supreme Court resolved an inconsistency in its jurisprudence about the standard for reviewing Strickland claims in collateral proceedings. Stephens held that under Strickland, both the performance and prejudice prongs are mixed questions of law and fact, with deference on appeal given only to the lower court's factual findings.  Id. at 1033.  But Stephens made clear that even under this test, "[w]e recognize and honor the trial court's superior vantage point in assessing the credibility of witnesses and in making findings of fact. The deference that appellate courts afford findings of fact based on competent, substantial evidence is an important principle of appellate review."  Id. at 1034.  In Porter v. State, the Florida Supreme Court relied on this very language from Stephens as requiring it to discount and discard the testimony of Mr. Porter's mental health expert's opinion which had been presented by Mr. Porter at his state court evidentiary hearing.  See Porter v. State, 788 So. 2d at 923–24.

cognitive defects.    While the State's experts identified perceived problems with the tests that Dr. Dee used and the conclusions that he drew from them, it was not reasonable to discount entirely the effect that his testimony might have had on the jury or the sentencing judge.

Porter v. McCollum, 130 S. Ct. at 454–55 (footnote omitted).

One way to characterize the problem in Mr. Evans's case is to say that the Florida Supreme Court analyzed Evans's Strickland claim the same way it did Mr. Porter's.  Compare Evans v. State, 946 So. 2d at 12, with Porter v. State, 788 So. 2d at 923.  Immediately after the Florida Supreme Court correctly identified Strickland as the governing standard for reviewing ineffective assistance of counsel claims in Mr. Evans's case, it stated:

> We defer to the trial court's findings of fact regarding the credibility of witnesses and the weight assigned to the evidence but review the deficiency and prejudice prongs de novo.  Windom v. State, 886 So. 2d 915, 921 (Fla. 2004) (citing Stephens v. State, 784 So. 2d 1028, 1034 (Fla. 1999).

Evans, 946 So. 2d at 10.  That the Florida Supreme Court expressly relied on Stephens in Mr. Evans's case signaled that it considered itself bound, based on its own precedent interpreting Strickland, to defer to the state postconviction trial court's findings on the existence of mitigation, including its resolution of conflicts in the evidence between the experts.

In Evans v. State, like in Porter v. State, the state habeas court discounted the opinions of Mr. Evans's two mental health experts about the existence and significance of mental health mitigation in his case.  The state trial court's order

64

denying postconviction relief acknowledged that both of Mr. Evans's experts agreed that, at the time of the offense, Evans met the criteria for Florida's statutory mental state mitigators,[7] in part due to his brain damage. See also Evans v. State, 946 So. 2d at 8. The state trial court also noted that the state's expert reached the opposite conclusion: Evans did not satisfy Florida's statutory mental health mitigators. See also id. at 8–9. The state trial court then went on to resolve the conflict between the experts' testimony as follows:

> The Court finds that [trial counsel] was not ineffective for failing to retain an expert witness to present evidence of brain damage suffered by Mr. Evans, in support of mitigation that Mr. Evans was under the influence of extreme mental or emotional disturbance at the time of the offense. Based on the testimony of [the state's expert], the Court finds that any brain damage suffered by [Mr. Evans] was minimal and did not support a conclusion he had an impulse control disorder. The Court also finds that defense counsel was not ineffective for failing to investigate and present evidence in support of statutory mitigation that Mr. Evans['s] capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired at the time of the offense. The defense experts' conclusions concerning [Mr. Evans's] mental state were completely rebutted by the State's expert.

Doc. 17, Exh. G-3 at 29. Indeed, the state trial court's order left little doubt that it completely discounted Mr. Evans's evidence of brain damage:

> The Court finds more credence in the testimony of [the state's expert] than in the testimony of the defense doctors presented. Although all

---

[7] See Fla. Stat. §§ 921.141(6)(b) ("The capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance."), and (6)(f) ("The capacity of the defendant to appreciate the criminality of his or her conduct or to conform his or her conduct to the requirements of law was substantially impaired.").

65

the doctors agree that he had some type of brain injury, the Court finds the defense has not established a sufficient 'link' between [Mr. Evans's] behavior and his actions the night of the murder, such that it could be considered a mitigator.[8]

Id. at 13 (footnote added).  These critical findings of fact about the non-existence of statutory and nonstatutory mitigation rendered the state court's prejudice analysis unreasonable because, just the same as in Porter v. State, the state trial courts "either did not consider or unreasonably discounted the mitigation evidence adduced in the postconviction hearing."  Porter v. McCollum, 130 S. Ct. at 454.

We have been instructed that in order to make the prejudice determination required by Strickland, a reviewing court must "consider the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding—and reweigh it against the evidence in aggravation."  Id.  at 453–54 (quotation marks and alteration omitted).  Where, as in Mr. Evans's case, the state courts unreasonably discount a capital defendant's mitigation, the state court fails to consider the "totality of the available mitigation evidence" as required by Strickland.

---

[8] The state trial court's requirement of a "nexus" between the mitigating evidence and the crime is also troubling because the U.S. Supreme Court has squarely rejected such a narrow definition of mitigation.  See Tennard v. Dretke, 542 U.S. 274, 285–87, 124 S. Ct. 2562, 2570–72 (2004) (stating that "impaired intellectual functioning is inherently mitigating" and that defendant need not establish nexus between mental capacity and crime for evidence to be relevant to mitigation); see also Hodge v. Kentucky, __ U.S. __, __, No. 11-10974, 2012 WL 5989825, *1 (Dec. 3, 2012) (Sotomayor, J., dissenting from denial of certiorari) ("Mitigation evidence need not, and rarely could, 'explai[n]' a heinous crime; rather, mitigation evidence allows a jury to make a reasoned moral decision whether the individual defendant deserves to be executed, or to be shown mercy instead.").

In light of the majority's opinion that nothing in Porter v. McCollum compels the conclusion I have reached in this case, there are a few points about my understanding of that case that bear emphasis. First, I do not read Porter v. McCollum's "did not consider or unreasonably discounted" language to impose a requirement on state courts that they must mention or address all of the mitigation presented in order to properly conduct Strickland's prejudice analysis. This much should be plain from the holding in Porter v. McCollum and even a cursory examination of the Florida Supreme Court's opinion in Porter v. State, 788 So. 2d at 921–25.[9] It is well settled that state court adjudications are entitled to AEDPA deference even if they are unaccompanied by opinions. See Cullen v. Pinholster, ___ U.S. ___, ___, 131 S. Ct. 1388, 1402 (2011) ("Section 2254(d) applies even where there has been a summary denial.").

Second, I do not read Porter v. McCollum as authorizing federal courts to review state court opinions as if we were grading papers. In fact, speaking of the role of the federal courts in those terms overlooks our solemn obligation and duty under AEDPA to consider whether the state court's adjudication of a prisoner's habeas action is contrary to, or an unreasonable application of, clearly established

---

[9] Said another way, the error recognized in Porter v. McCollum cannot be merely that the Florida Supreme Court failed to address or discuss the new mitigating evidence in its opinion. Even a cursory examination of the Florida Supreme Court's opinion in Porter v. State reveals that that court explicitly addressed Porter's new mitigating evidence by reviewing the evidence adduced at the state court evidentiary hearing at length. See 788 So. 2d at 921–25.

67

Supreme Court precedent or an unreasonable determination of the facts.  See 28 U.S.C. §2254(d).  Having said that, I fully recognize that Porter v. McCollum did nothing to undo, or recede from, the wide latitude and deference owed state court adjudications on the merits under AEDPA.  But when evaluating a state habeas prisoner's petition, "a habeas court must determine what arguments or theories supported or, if none were stated, could have supported the state court's decision; and then it must ask whether it is possible that fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of the Supreme Court."  Reese v. Sec'y, Fla. Dep't of Corr., 675 F.3d 1277, 1286 (11th Cir. 2012) (quoting Harrington, 131 S. Ct. at 786)) (alterations omitted).  So where, as here in Mr. Evans's case, the state court goes to the trouble of supporting its ruling with a written opinion, it is proper that federal courts carefully consider the analysis provided.  Certainly, the same principles of comity and federalism that animate our deference to state courts, dictate that when we examine a state court's stated reasons, we accept that the state court says what it means and means what it says in its opinions. That being the case, when the Florida Supreme Court said it was going to rely on Stephens to evaluate Mr. Evans's Strickland claim, I accept that it did.

Third, I do not read Porter v. McCollum as announcing a new rule of law or in any way modifying Strickland's prejudice standard.  At the same time, Porter v.

68

McCollum is more than just an application of Strickland to a single set of facts. Rather, Porter v. McCollum also teaches federal courts how to properly apply the "unreasonable application" prong of AEDPA. After all, we must be mindful that the United States Supreme Court not only held that the Florida Supreme Court unreasonably applied clearly established federal law, but it also reversed this Court's judgment in Porter v. Attorney General, 552 F.3d 1260, 1274 (11th Cir. 2008), that the Florida Supreme Court's opinion in Porter v. State, 788 So. 2d 917, was entitled to deference under AEDPA. See Porter v. McCollum, 130 S. Ct. at 456.

Finally, Porter v. McCollum makes clear that an evaluation of the mitigating evidence presented to establish prejudice under the prejudice prong of the Strickland standard must be evaluated from the perspective of the sentencing jury. The issue is not what impact the evidence of prejudice had on the judge presiding at a collateral evidentiary hearing, but what impact that evidence may have had on the jury who heard the case if it had been presented. See Porter v. McCollum, 130 S. Ct. at 454–55.

For each of these reasons, I have concluded the state court's adjudication of Mr. Evan's penalty phase ineffective assistance of counsel claim is not entitled to deference under 28 U.S.C. § 2254(d)(1) and (2).

IV.

Under de novo review, I conclude that Mr. Evans has satisfied Strickland's demanding standard for finding both that his counsel was deficient and that Mr. Evans was prejudiced by that deficiency. Based on the facts set out above, I have no doubt that his trial counsel's investigation of Mr. Evans's life history was constitutionally deficient. The result was that Mr. Evans's jury never heard about his closedhead injury at age three, resulting brain damage, learning disabilities, and impulse control problems. I understand this to be precisely the kind of troubled history the U.S. Supreme Court has "declared relevant to assessing a defendant's moral culpability." Porter v. McCollum, 130 S. Ct. at 454 (citing Wiggins, 539 U.S. at 513, 123 S. Ct. at 2531).

When I reweigh all of the mitigating and aggravating evidence, both from the trial and the state postconviction proceeding, I conclude that "there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Strickland, 466 U.S. at 695, 104 S. Ct. at 2069. On the aggravating side of the ledger, the penalty phase jury heard a lot of evidence about why a death penalty should be imposed on Mr. Evans. Much of the new aggravating evidence introduced at the postconviction hearing was cumulative of

70

the evidence the jury had already heard, and would not have significantly altered the weight on the aggravating side of the scale.[10]

On the mitigating side of the ledger, the sentencing jury was given little if any evidence to support a decision not to impose the death penalty. I am aware that the jury was presented with, and the trial court found, nonstatuory mitigating evidence that portrayed Mr. Evans's in a positive light. See Evans v State, 838 So. 2d 1090, 1097 (Fla. 2002). But Mr. Evans's counsel gave the jury no basis for understanding how someone of purported "good character" could have gone so tragically off course as to shoot and kill Angel Johnson. This, when there was

---

[10] For several reasons, I think the majority gives too much weight to the supposed negative impact it imagines Mr. Evans's jury would have placed on expert opinion from the state postconviction hearing that Mr. Evans suffers from antisocial personality disorder (ASPD). First, under Florida law, ASPD is considered a "valid mitigating circumstance for trial courts to consider and weigh." Morton v. State, 789 So. 2d 324, 329–30 (Fla. 2001); see also Morton v. Sec'y, Fla. Dep't of Corr., 684 F.3d 1157, 1168 (11th Cir. 2012) ("[T]here cannot be a per se rule that a lawyer renders ineffective assistance by presenting evidence of antisocial personality disorder for purposes of mitigation."). Second, to the extent an ASPD diagnosis in Mr. Evan's case might have been aggravating, rather than mitigating, any adverse impact of this labeling would have been merely cumulative to the various incidents of violence and antisocial tendencies the jury already knew about. The jury did not need an expert to tell them that Mr. Evans had ASPD to evaluate his moral culpability based on the totality of the evidence known to them. Cf. Belmontes, 130 S. Ct. at 388 (rejecting notion that mitigating evidence would have carried "greater weight" if it had been submitted with expert testimony because, where the evidence was not complex, the jury "could use its common sense" to understand its significance). Further, assuming the jury had been told Mr. Evans suffers from ASPD, we must also consider that reasonably competent counsel could have mitigated the impact of such a diagnosis by focusing on those troubled aspects of Mr. Evans's background which led to the development of the disorder. In any event, we know that a diagnosis of ASPD does not preclude a finding of Strickland prejudice where counsel otherwise fails to investigate and present powerful mental health mitigating evidence. For example, the Supreme Court granted penalty phase relief in Porter v. McCollum even though the state's expert opined that Mr. Porter had met most of the diagnostic criteria for ASPD. See Porter v. Crosby, No. 6-03-cv-1465-Orl-31KRS, 2007 WL 1747316, *28 (M.D. Fla. June 18, 2007).

71

powerful and constitutionally relevant evidence that existed in the case. I understand the Supreme Court to have taught us that juries should know about this kind of information so that they can make individualized sentencing determinations. As they have said, "[a] process that accords no significance to relevant facets of the character and record of the individual offender or the circumstances of the particular offense excludes from consideration in fixing the ultimate punishment of death the possibility of compassionate or mitigating factors stemming from the diverse frailties of humankind." Woodson v. North Carolina, 428 U.S. 280, 304, 96 S. Ct. 2978, 2991 (1976).

For me, it cannot be correct that Mr. Evans's childhood head injury and the devastating effects it had on his life were entitled to no weight, simply because introduction of those facts would have also resulted in the jury hearing more bad facts about him. This is particularly true when those bad facts are so similar in kind to the negative evidence the jury had already heard. The explanation of why an individual committed a horrific crime and other bad acts which may aggravate the crime is what the Eighth Amendment jurisprudence labels as mitigating. I cannot ignore the reasonable probability that a jury would have returned with a different sentence had they learned about how Mr. Evans succumbed to the frailties inherent in his own life. I would therefore grant him habeas relief.